IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| PEGGY J. BROCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV 07-1534-PK |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social | ) | OPINION AND ORDER |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

PAPAK, Magistrate Judge:

Plaintiff Peggy Brock challenges the Commissioner's decision denying her applications for

disability insurance benefits and supplemental security income payments under Titles II and XVI of

the Social Security Act.  The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c).

The parties consent to the jurisdiction of the Magistrate Judge to enter a final order and judgment

in accordance with F.R.C.P. 73 and 28 U.S.C. § 636(c).  I affirm the Commissioner's decision.

The court reviews the Commissioner's decision to ensure that proper legal standards were applied and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). The administrative law judge ("ALJ") applied the five-step sequential disability determination process set forth in 20 C.F.R. §§ 404.1520 and 416.920. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Brock argues the ALJ improperly assessed her residual functional capacity ("RFC") and erroneously concluded she retains the ability to perform her past work.

## I.    RFC Assessment

The RFC assessment is the ALJ's determination of the work-related activities a claimant can still do on a sustained, regular, and continuing basis despite the functional limitations imposed by her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184. The RFC assessment must be based on all the evidence in the case record, and the ALJ must consider all allegations of limitations and restrictions. SSR 96-8p, 1996 WL 374184 * 5. Brock contends the ALJ erred by improperly rejecting her testimony, the testimony of her friend Karen Hunt, and the medical opinions of treating and examining sources. She argues the ALJ improperly relied on the testimony of a medical expert and failed to comply with SSR 96-8p.

### A.    Brock's Credibility

Brock alleged she became disabled on April 30, 2002, due to asthma, tendinitis in the right shoulder and neck, migraines, obesity, depression, diabetes, hypertension, and lower back pain. Admin. R. 230, 243, 491. Her testimony from January 2005 is summarized here. She had asthma attacks every day, lasting five to ten minutes. Her asthma medications caused shakiness, trouble sleeping, and impaired concentration. *Id.* at 492. Pain in her right shoulder prevented her from

lifting her right hand above her head. She could not steer her car or lift over four pounds with her non-dominant right hand. *Id.* at 493, 500. Brock's neck was always stiff and her low back hurt if she sat at her computer for one hour. After sitting for one hour, she had to lie down to alleviate the pain in her lower back. *Id.* at 494-95. She experienced clusters of migraines in a repeating pattern of frequent migraines for two or three weeks followed by a month without migraines. *Id.* at 495. Brock took Prozac for depression, which helped her control her temper, but left her unable to concentrate. *Id.* at 496. Walking just 10 to 15 steps caused her to become short of breath. *Id.* at 499. She could stand for about 30 minutes and sit for about one hour at a time. *Id.* at 501.

Brock testified again in 2007. Her diabetes medication caused her to urinate frequently, sometimes as much as every 20 minutes. *Id.* at 1010. Other medication side effects included heartburn and fatigue. *Id.* at 1023. She reported spending 16 to 18 hours a day in bed, but could not sleep. *Id.* at 1024. She typically would take two twenty-minute naps during the day. *Id.* at 1024. She had worsening concentration and memory problems. *Id.* at 1012, 1029. She had an increase in diffuse body pain due to fibromyalgia. *Id.* at 1029. She had daily temper outbursts and crying spells due to depression. *Id.* at 1030. When she had to lose weight to qualify for a surgical procedure, she swam for 30 minutes, three times a week and lost 25 pounds. She quit after two weeks. *Id.* at 1027-28, 1034.

The ALJ accepted that Brock suffers from asthma, degenerative disc disease of the cervical and lumbar spine, morbid obesity, gastroesophageal reflux disease, sleep apnea, hypertension, osteoarthritis of the right shoulder, and diabetes mellitus. He found she could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently, stand or walk at least two hours of an eight-hour workday, sit for at least six hours of an eight-hour workday, and reach overhead frequently but

not constantly. Brock had postural limitations and could not climb. She could not tolerate concentrated exposure to extremes of temperature or humidity, gases, fumes, or odors. Medication side effects made hazardous work situations inappropriate. *Id.* at 531.

The ALJ did not accept Brock's assertions of functional limitations in excess of this RFC assessment. *Id.* at 531. His RFC assessment effectively rejected her asserted inability to raise her right arm over her head, lift more than four or five pounds, sit for over one hour without lying down, concentrate and remember sufficiently to engage in work tasks, sustain a normal work schedule due to frequent breaks to urinate and nap, and behave appropriately in work settings without temper outbursts or crying spells. The ALJ found Brock's statements about the intensity, persistence, and limiting effects of her symptoms not credible. *Id.* at 534.

In deciding whether to accept subjective statements, an ALJ must perform two stages of analysis. The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir. 1996); *Cotton v. Bowen*, 799 F2d 1403, 1407-08 (9th Cir 1986). There is no dispute about the first stage in this case.

At the second stage, an ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Smolen*, 80 F.3d at 1283. An ALJ may consider objective medical evidence, the claimant's treatment history, daily activities and work record, and the observations of treating sources and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F.3d at 1284; SSR 96-7p, 1996 WL 374186. The ALJ must make findings that are "sufficiently

specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

The ALJ found the objective medical evidence, treatment history, and reports of medical providers did not support Brock's assertions of disabling symptoms. Brock alleged disability beginning April 30, 2002, the day she received emergency room treatment for back and neck pain after a rear-end motor vehicle accident. Admin. R. 297-98. Diagnostic images of the cervical spine were negative. *Id.* at 299. By June 2002, Brock could drive without pain or stiffness and sit comfortably without limitation. *Id.* at 406. On June 7, Robert Young, M.D., released Brock to return to light duty at her bus-driving job, but Brock indicated she was not planning to work during the summer unless she felt better. *Id.* at 319. In July, Brock "stated that she would feel comfortable returning to work at this time." *Id.* at 399. Dr. Young released Brock to perform full work duties on July 3, 2002, but she did not return to work. *Id.* at 317. On July 18, 2002, Brock told Dr. Young she had been terminated for taking too many days off. *Id.* at 314. Brock could sit and stand comfortably and had only mild limitation bending forward at the waist, walking for half a mile without limping or resting, and looking over each shoulder. *Id.* at 383. Dr. Young opined she was able to function despite some discomfort. *Id.*

The ALJ could reasonably conclude Brock had no disabling impairments at the alleged onset of disability in April 2002 when Brock was terminated from her job. The ALJ could reasonably draw an adverse inference as to Brock's credibility from the minimal medical findings and the evidence that her job ended because she failed to return to work when able and not because of her impairments. *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001)(Stopping work for non-medical reasons is a sufficient basis for disregarding subjective testimony).

The record does not support Brock's assertions of debilitating asthma symptoms. In April 2002, Brock reported a history of asthma and indicated it hurt to take a deep breath. Dr. Young noted minimal coughing and no asthma. Admin. R.327. In August 2002, Brock reported she had used an albuterol nebulizer during the preceding week due to hot weather and exposure to second hand smoke, but her lungs were "fairly good otherwise." *Id.* at 312. Gregory Irvine, M.D., found no asthma in August 2002. *Id.* at 659. In September 2002, Brock told Dr. Young her asthma was "ok now." *Id.* at 310.

In December 2003, Brock sought emergency treatment after one week of coughing fits, coinciding with the expiration of her albuterol prescription. She was treated with a course of prednisone and vicodin and given an albuterol refill. *Id.* at 647-48. In October 2004, Brock sought emergency care for one week of coughing fits disturbing her sleep. This coincided with her inability to use her albuterol nebulizer because she had lost part of the equipment. She was treated with acetaminophen and codeine and her missing equipment was replaced. *Id.* at 459-60. In followup, Brock's primary care physician Kerry Rasmussen, M.D., ordered a course of prednisone and pulmonary function tests. *Id.* at 446. The pulmonary function tests showed normal spirometry and chest x-rays were unremarkable. *Id.* at 450, 453, 457, 458, 636.

In February 2005, Brock had a pulmonary/sleep consultation with Howard Lazarus, M.D., due to coughing, breathlessness, and sleep disturbance. She had not been using her therapeutic maintenance inhalation medication properly. Dr. Lazarus gave her detailed instructions, prescribed a bronchodilator and recommended a sleep study for obstructive sleep apnea. *Id.* at 635-37. In March 2005, pulmonary function test studies again showed normal spirometric analysis. *Id.* at 631. In May 2005, Dr. Lazarus opined that Brock had mild asthma which was well controlled. *Id.* at 628.

In January 2006, Brock told Dr. Rasmussen her asthma was doing great and she had not had a flare-up since Dr. Lazarus started her on Singular for inhalation maintenance. *Id.* at 857.

The ALJ could reasonably conclude from the intermittent complaints, treatment history, and medical opinions that Brock had intermittent problems with asthma, usually associated with noncompliance with prescribed treatment. She had a significant flare up for several months, but in general, her symptoms were mild and under control when she properly used her prescribed medications.

The medical evidence, treatment history, and reports of medical sources did not support Brock's claims of persistent debilitating limitation from tendinitis of the right shoulder and neck. In August 2002, Brock consulted Dr. Irvine, an orthopedic specialist, for right shoulder pain reportedly restricting her ability to raise her arm above shoulder level with any strength. *Id.* at 659. On physical examination, Brock had moderate tenderness with limited range of motion in the cervical spine, but her shoulder was only mildly tender in places with full range of motion and an equivocal impingement sign. Her neurologic examination and x-rays were normal. *Id.* at 658-59. A followup MRI scan was completely normal. *Id.* at 658, 680.

Brock had no shoulder or neck symptoms for nearly three years. Then in April 2005, she re-aggravated her neck and shoulder problems in a bathtub fall. Dr. Irvine found she had good range of motion in both shoulders with only minor irritation. She again had some limitation in her cervical range of motion. *Id.* at 655. In June 2005, Brock was not compliant with prescribed physical therapy. Subjectively, both shoulders were equally painful. On examination, her shoulders were slightly tender to palpation with range of motion limited by subjective pain. Her neck was guarded but pain free. Dr. Irvine diagnosed bilateral rotator cuff syndrome and prescribed conservative

treatment with physical therapy and over-the-counter anti-inflammatory medication. *Id.* at 654.  Dr. Irvine continued conservative treatment until February 2007, when he surgically repaired a partial rotator cuff tear in Brock's right shoulder.  *Id.* at 898.

The ALJ could reasonably infer from the mild objective findings, the long periods in which Brock did not seem to have symptoms in her right shoulder, the conservative treatment prescribed, and Brock's inconsistent compliance with treatment, that she did not have persistently debilitating limitation in the right shoulder and neck as she claimed.

Similarly, the evidence did not support persistent debilitating symptoms in the back and neck. As noted previously, following the motor vehicle accident that triggered her alleged disability, her neurologic examination, x-rays, and MRI scans were completely normal.  *Id.* at 658-59, 680.  In October 2005, Brock reportedly "threw out her back" while vacuuming.  *Id.* at 689.  Gordon Wolfe, M.D., found clinical signs of L5 radiculitis on the right.  *Id.*  X-ray films of the lumbar spine did not support this, however.  They showed mild vertebral spurring in the lumbar spine, but no spinal cord or nerve root impingement.  *Id.* at 946, 979.  In March 2006, Brock sought emergency care for multiple problems including complaints of lower lumbar discomfort with some radiation down the left leg.  *Id.* at 823.  X-rays showed no significant degenerative disk disease, facet disease, or any acute abnormalities related to the lumbosacral spine.  *Id.* at 880.  Computed tomography of the lower lumbar spine showed some degeneration at L4-5, but no canal stenosis, impingement of the neural foramina, or abnormality of the facets.  *Id.* at 881.  The CT results did not support any neurologic problem or justify a neurosurgery consultation.  *Id.* at 809. In August 2006, Brock suffered a back sprain moving her daughter's wheelchair and was treated conservatively with heat and ice.  *Id.* at

772.  She did not seek treatment for back or neck pain from then through the close of the record in

April 2007.

The ALJ could reasonably infer from the mild objective findings, intermittent complaints,

inconsistent descriptions of symptoms, and conservative treatment that Brock's neck and lower back

pain did not cause persistent debilitating limitations as she claimed.

Similarly, Brock's claims of persistently debilitating migraines are not supported.  Although

her disability allegedly began in April 2002, the first report of significant headaches appeared in

treatment notes from August 2003.  Brock complained of a headache that felt similar to migraines

she reportedly experienced in the past, but for which she produced no records.  She had a normal CT

scan of the brain and her headache was completely relieved with Toradol.  *Id.* at 614-16.  When she

established care with Dr. Wolfe in July 2005, she did not include migraines or headaches in her

extensive list of medical problems.  *Id.* at 696.  She next received treatment for such symptoms in

August 2005, when Brock complained of "cluster headaches" occurring daily for a couple of weeks

and then going away.  *Id.* at 694.  Dr. Wolfe recommended a trial of Topamax.  *Id.* at 691.  Brock

did not start Topamax until October 2005, after which Dr. Wolfe noted that low doses had abolished

her headaches.  *Id.* at 689, 690.

In March 2006, Brock sought emergency treatment for a severe headache and obtained

significant immediate improvement with Toradol.  A CT scan of the brain was normal.  *Id.* at 830-

33, 883.  In June 2006, Brock again sought emergency care for a severe headache after missing all

of her medications while away from home.  She again received immediate relief from Toradol.  Her

neurological examination and CT scan of the brain were normal.  She was counseled to maintain her

normal medication schedule.  *Id.* at 937-38, 978.  Brock experienced another severe headache in

August 2006, which she associated with anxiety over the recent death of her mother.  Her neurologic examination, CT scan of the brain, and laboratory blood analysis were normal.  An injection of Toradol did not resolve the headache, but she returned to receive morphine sulphate which did.  *Id.* at 774, 776, 779, 877, 878.  Brock did not report headaches again through the close of the record.

The ALJ could reasonably conclude that Brock's headaches are infrequent and responsive to treatment.  They occur more frequently with failure to adhere to her prescribed medication schedule and with situational anxiety, but in general are far less persistent than suggested by her testimony.  The ALJ could draw an adverse inference as to credibility from the apparent lack of candor in her assertions of persistent debilitating migraines.

The medical evidence, treatment records, and reports of medical sources did not support Brock's claims of daily debilitating depressive symptoms or significant side effects from antidepressant medications.  Brock reported a long history of depression and apparently has taken Prozac for years.  *Id.* at 710.  She did not claim psychological symptoms or seek mental health care during the time that is relevant in this case until June 2005, three years after the alleged onset of disability.  When she did so, Brock denied current depression.  Instead, she asked for an evaluation for attention deficit hyperactivity disorder ("ADHD").  Chris Camplair, Ph.D., agreed that her subjective history of lifelong problems controlling her temper, completing tasks, and avoiding distractions reflected clear signs of ADHD.  Dr. Camplair recommended a trial of appropriate medication through her primary care provider.  *Id.* at 705, 710.  Despite several opportunities while receiving routine care, Brock did not mention ADHD or Dr. Camplair's recommendation to her primary care physician until August 22, 2005.  *Id.* at 692, 696.

Brock first complained of depressive symptoms, including poor motivation, ease to anger, tearfulness at times, general sadness, anhedonia, and sleep disturbance, when she saw Dr. Wolfe on August 22, 2005. *Id.* at 693. Dr. Wolfe discontinued her long-standing Prozac prescription and began titrating Effexor. *Id.* After two weeks, Brock reported Effexor had helped her a great deal with her problems in focus, concentration, and memory. *Id.* at 692. Brock continued to improve with increasing doses of Effexor. In October 2005, Dr. Wolfe opined her depression was doing well on her then-current dose of Effexor. *Id.* at 689. When Brock transferred primary care back to Dr. Rasmussen in January 2006, she did not mention depressive symptoms in her extensive list of health problems, but indicated she would like to start medications for ADHD. *Id.* at 857. In May 2006, Brock transferred primary care to Catherine Chester, M.D., and reported her depression was controlled by Effexor. *Id.* at 805.

In June 2006, Dr. Rasmussen indicated Brock's depression was under good control with Effexor, although she was suffering situational anxiety because her mother was in hospice care and her daughter had been hospitalized with a stroke. *Id.* at 790. Dr. Rasmussen prescribed anxiolytic medication for the acute anxiety episode. *Id.* In July 2006, Brock sought emergency treatment for visual hallucinations of Disney characters and a fluctuating episodic altered mental status, possibly associated with her anxiolytic medication or dehydration. *Id.* at 785, 929-30.

In January 2007, Steven Dickinson, Psy.D., conducted a neuropsychological screening examination. Brock's mood was euthymic and Dr. Dickinson observed no behavior suggesting anxiety or evident symptoms of depression or ADHD. Brock persevered through the 5-hour examination with concentration intact. Testing showed impressive cognitive skills, including stamina, perseverance, and average to superior memory, findings which contradict Brock's assertions

of concentration and memory deficits.  Dr. Dickinson found Brock had consistent intellectual strengths across global areas of functioning, without cognitive-based impairments that would prevent her from participating in vocational rehabilitation programs or exercising her own judgment in selecting an area of employment suited to her abilities and needs.  *Id.* at 741-45.

On the MMPI-2, Brock responded in a manner consistent with others who were known to have exaggerated their physiological and psychiatric symptoms, had likely exaggerated their deficits overall, and were not in significant distress.  *Id.* at 743-44.  Dr. Dickinson noted people with MMPI-2 profiles similar to Brock's often have conversion or somatoform disorder diagnoses.  *Id.* at 744. He assigned a Global Assessment of Functioning ("GAF") of 63, indicating "some mild symptoms" or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well."  *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994)("*DSM-IV*") 30-32. *Id.* at 744.  Dr. Dickinson opined Brock had no limitation in understanding, remembering, and carrying out short, simple instructions and slight limitation with respect to detailed instructions.  He indicated Brock had slight limitation interacting with the public and supervisors and moderate limitation interacting appropriately with co-workers.  *Id.* at 747-48.

The foregoing indicates Brock's depression was controlled by medication, her anxiety was situational and short-lived, and her ADHD diagnosis was supported only by her subjective history which was likely exaggerated.  Her alleged concentration and memory problems are contradicted by Dr. Dickinson's evaluation.  Accordingly, the ALJ reasonably concluded Brock's assertions of persistent daily depression symptoms and problems with memory and concentration were not credible.

The ALJ also did not believe Brock's assertions regarding fibromyalgia. Brock began attributing her chronic pain to fibromyalgia in January 2006, when she reestablished care with Dr. Rasmussen after receiving primary care from Dr. Wolfe for a year. *Id.* at 856. Brock told Dr. Rasmussen an unidentified physician outside the Kaiser Permanente system had diagnosed her with fibromyalgia and started her on Vicodin. *Id.* at 856-57. Notably, there is no record that Dr. Wolfe or any other physician diagnosed fibromyalgia before Brock made this claim to Dr. Rasmussen.

Dr. Rasmussen ordered a followup rheumatology consultation with William Melcher, M.D. *Id.* at 852. Brock told Dr. Melcher she had experienced chronic pain for 10 years and had an old fibromyalgia diagnosis for which she had no records. She also claimed a family history of fibromyalgia affecting her mother and grandmother. On physical examination, Dr. Melcher found multiple tender points, but did not state whether they satisfied the diagnostic criteria for fibromyalgia or simply failed to rule it out. *Id.* at 855. He prescribed vicodin and nortriptyline to help with Brock's reported pain and sleep disturbance and counseled Brock that fibromyalgia was usually not a disabling condition. *Id.* at 844.

When Brock established care with Dr. Chester in May 2006, she reported a history of fibromyalgia and claimed she stayed in bed 15 hours a day with heat on her back for relief. *Id.* at 805. Dr. Chester found multiple tender points but did not state whether they were diagnostic for fibromyalgia or simply failed to rule out the subjective claims. *Id.* at 806.

The ALJ could reasonably find it was not credible for Brock to have an old diagnosis of fibromyalgia and a three-generation family history of fibromyalgia, yet fail to allege fibromyalgia in her disability report, fail to mention the impairment to medical providers until four years after the

alleged onset of disability, and be unable to produce records or name the physician who first diagnosed her with fibromyalgia.

The ALJ did not accept Brock's assertion regarding extreme urinary urgency as a medication side effect. In 2005, Brock testified she had to go to the bathroom at least once per hour; in 2007 she testified it had worsened to once every 20 minutes. This level of urgency is not reflected in Brock's reports to medical providers or in the extensive lists of health problems and side effects. Dr. Dickinson did not indicate Brock needed extra rest breaks during his 5-hour evaluation, noting the contrary that she persevered through at least one scheduled rest period to move on to the next task. Brock was able to ride 90 minutes on casino buses and the lay reports of her activities did not indicate unusually frequent trips to the bathroom. The ALJ could reasonably expect such an intrusive side effect to be reflected in these information sources. *Id.* at 536-37.

The ALJ found Brock's credibility adversely affected by the reports of her activities. For example, shortly after the alleged onset of disability, Brock went camping, traveled to Los Angeles, and walked around a large shopping mall. She was able to concentrate well enough to play cards and bingo. While these activities are not equivalent to full-time work activities, they are inconsistent with Brock's allegations that she become short of breath after walking only 10 to 15 steps, cannot sit for longer than one hour, or stand for more than 30 minutes or concentrate on anything. *Id.* at 499, 501, 534.

The ALJ also found Brock's testimony inconsistent with the activities described in her daughter's written statement and in the testimony of her friend Karen Hunt. Brock's daughter reported that Brock drives, goes to physical therapy, plays bingo, goes to movies, uses the computer for two to three hours a day, watches television for up to two hours a day, exercises on a treadmill

for up to 20 minutes at a time, and goes to casinos.  She said Brock got along well with friends, relatives, neighbors, store clerks, and others in the general public.  *Id.* at 274-85.  The ALJ could reasonably find these activities inconsistent with the extreme limitations Brock claimed in her ability to sit, walk, concentrate, remember, and interact with others.

Karen Hunt testified that she visits Brock two or three times a week, often going to a restaurant to eat and play cards.  Sometimes they go to the mall, sometimes to the casino in Grande Ronde, and sometimes they just sit and talk.  The casino is a 90-minute drive from the Portland area where Brock lives, and 45 minutes from the Salem area where Hunt lives.  At the casino, they walk around, sit, talk, eat at the buffet, and play slot machines or bingo.  On New Years Eve, Hunt and Brock met at a casino and played bingo from 7:00 p.m. until after midnight.  Admin. R. 509-14. Brock has no difficulty sitting for two hours to play a game of bingo, unless second hand smoke bothers her and makes her cough.  *Id.* at 512.  Hunt's statement that Brock sometimes calls and cannot remember why she called does not establish persistent, debilitating loss of memory.  *Id.* at 509.  The ALJ could reasonably find these activities inconsistent with Brock's allegation that she cannot walk more than 10 to 15 steps, sit for more than one hour, or concentrate or remember anything.

The ALJ noted that Brock was repeatedly found to be in noncompliance with physical therapy, recommended exercise programs, and medication therapy.  He relied on treatment records showing that most of her symptoms were alleviated with conservative treatment.  It is reasonable to expect a person experiencing debilitating symptoms to follow therapy shown to alleviate them. When a claimant makes subjective statements about disabling symptoms, but fails to comply with

prescribed treatment, an ALJ may reasonably find the subjective statements unjustified or exaggerated. *Orn v. Astrue,* 495 F3d 625, 638 (9th Cir 2007).

The ALJ also found Brock's statement that she and her husband sold their house because she could not climb the stairs appeared to be less than candid. There is no mention of this event or Brock's inability to climb stairs in the reports to medical providers or the lay witness statements and testimony. The ALJ could reasonably expect such an intrusive impairment to be reflected somewhere in the record.

In summary, the ALJ's reasons for discrediting Brock's subjective statements, including the mild medical findings, the conservative treatment Brock received, her repeated failure to follow treatment recommendations, the evidence that Brock did not stop working for medical reasons, her ability to engage in activities suggesting she is not impaired as persistently or intensely as she described, and her MMPI-2 profile suggesting a propensity to exaggerate her symptoms, are clear and convincing and rest on reasonable inferences drawn from the record as a whole. *Bruton,* 268 F.3d at 282; *Smolen,* 80 F.3d at 1284; SSR 96-7p, 1996 WL 374186. The ALJ's findings are sufficiently specific to permit the court to conclude he did not discredit Brock's testimony arbitrarily. *Orteza*, 50 F.3d at 750. Accordingly, the ALJ's credibility determination is upheld.

**B.    Lay Witness Testimony**

As described previously, Karen Hunt testified Brock engaged in walking around shopping malls, taking the 90-minute drive to visit casinos, gambling, and playing cards, slot machines, and bingo. Admin. R. 509-14. Hunt said Brock has difficulty walking for any length of time. When they walk, Brock stops to rest frequently and Hunt waits for her to catch her breath or stop coughing. *Id.* at 508. Hunt said Brock's coughing fits have become worse over time. *Id.* at 509.

The ALJ found Hunt's testimony generally credible.  Indeed, he found Hunt's description of their activities inconsistent with Brock's allegations, as described above.  Brock contends the ALJ failed to give sufficient weight to the parts of Hunt's testimony which were favorable to her claim. For example, Brock contends the ALJ ignored Hunt's testimony that Brock must stop to rest and catch her breath frequently when they walk and sometimes forgets why she called Hunt on the telephone.

Friends and family members and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition.  *Dodrill v. Shalala,* 12 F.3d 915, 918 (9th Cir. 1993).  Such testimony cannot be disregarded without comment.  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).  If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness.  *Id.*

Here, the ALJ did not disregard Hunt's testimony without comment.  He found Hunt's testimony provided a generally credible account of her lay observations of Brock's activities. Admin. R. 538-39.  The ALJ was not required to state reasons for discrediting her testimony because he found it credible.  The ALJ could reasonably find the vague limitations Hunt observed, such as the frequent rest breaks while walking and forgetfulness on the telephone, consistent with the RFC assessment he achieved.  The ALJ's evaluation of Hunt's testimony is based on inferences rationally drawn from the record and will not be disturbed.  *Batson*, 359 F.3d at 1193; *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995),

C. **Medical Source Statements**

Brock contends the ALJ improperly rejected the disability opinions of Drs. Camplair, Wolfe, and Chester, and part of Dr. Dickinson's opinion.  An ALJ can reject a treating or examining

physician's opinion in favor of the conflicting opinion of another physician, if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002) quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the treating physician's opinion is not contradicted by another physician, then the ALJ may reject it for clear and convincing reasons. *Id.*

Brock first saw Dr. Camplair on a self-referral for evaluation of ADHD on June 9, 2005. Admin. R. 710. She participated in eight counseling sessions over six months with Dr. Camplair. *Id.* at 706-09. On November 21, 2005, Dr. Camplair opined that Brock had "significant mental health issues and problems that would make it very difficult for her to find and maintain employment." *Id.* at 704. Dr. Camplair specified "difficulty sustaining concentration and in attending to important information" due to ADHD, social isolation and difficulty interacting with others, difficulty understanding concepts and ideas, and impulsiveness. *Id.*

The ALJ gave Dr. Camplair's opinion little weight. He found Dr. Camplair's opinion based primarily on Brock's subjective statements and directly contradicted by the findings of Dr. Dickinson. *Id.* at 539. Dr. Camplair based his disability opinion on his assessment of Brock, the difficulties he encountered during therapy sessions with her, and his experience treating others. *Id.* at 704. His intake summary was comprised of Brock's subjective report of life-long problems avoiding distractions, forgetting things, and completing tasks. She claimed an extensive family history of such problems. Notably, she reported she quit her job as a bus driver because of the distractions involved in that work, an account that is contrary to contemporaneous evidence showing she was terminated for unauthorized absences after her motor vehicle accident.

There is no record that Dr. Camplair consulted Brock's past treatment records, administered formal testing, or recorded clinical findings other than the conclusion that her reported difficulties were "clear signs and symptoms" of ADHD.  *Id.* at 710.  His progress notes from counseling sessions, to the extent they are readable, summarize discussions about medications, her primary care provider, and additional subjective reports of symptoms.  Because none of these records suggest another basis for Dr. Camplair's opinion, the ALJ could reasonably infer that it was based primarily on Brock's subjective statements.

An ALJ can properly reject a physician's disability opinion that is premised on the claimant's own subjective complaints of symptoms which the ALJ has properly discounted.  *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  The ALJ properly found Brock's subjective statements were unreliable for reasons already described.  Accordingly, the ALJ could properly discount Dr. Camplair's opinion.

The ALJ chose to rely on the findings and opinion of Dr. Dickinson.  *Id.* at 539.  Testing during his comprehensive neuropsychological screening evaluation showed that Brock had impressive cognitive skills, including stamina, perseverance, and average to superior memory.  She was able to complete the 5-hour evaluation with her concentration intact.  She had consistent intellectual strengths across global areas of function.  Dr. Dickinson found no evidence of ADHD or concentration problems.  Despite Dr. Camplair's statement that Brock had difficulty understanding ideas during therapy, Dr. Dickinson concluded from his evaluation that Brock would have no limitations in understanding, remembering or carrying out simple instructions and no more than slight difficulty with detailed instructions in a work setting.  *Id.* at 536, 741-45.

In summary, the ALJ gave greater weight to Dr. Dickinson's opinion than to the opinion of Dr. Camplair because Dr. Dickinson's evaluation was more comprehensive, the formal testing refuted many of Dr. Camplair's findings, and Dr. Camplair's opinion was based primarily on unreliable subjective reporting. *Id.* at 536, 537, 539. These are specific, legitimate reasons based on substantial evidence in the record and the ALJ's evaluation of Dr. Camplair's opinion is sustained. *Thomas v. Barnhart*, 278 F.3d at 956-57; *Magallanes v. Bowen*, 881 F.2d at 751.

Dr. Wolfe had been Brock's primary care provider for about one month when he issued a disability opinion in a letter to Brock's attorney. Admin. R. 687-88, 696-97. He stated Brock had been unable to work since 2002 "primarily as a result of degenerative changes in her shoulders." *Id.* at 687. In addition, he opined Brock was "markedly depressed, manifesting symptoms of marked fatigue, tearfulness, irritability, problems with focus, sleep disturbance . . . sadness, and anhedonia." *Id.* Dr. Wolfe opined that morbid obesity was the primary source of her problems. He indicated Brock could not use her upper extremities and had limited ability to stand for very long due to arthritis in the shoulders, knees, and hips. He opined Brock had been disabled for three years and would remain so permanently. *Id.* at 688.

The ALJ accepted Dr. Wolfe's opinion that Brock had severe impairments resulting in large part from her morbid obesity. He did not accept Dr. Wolfe's opinion that she was "unable to work" but acknowledged that she was restricted to a very narrow range of modified sedentary work with lifting in the light range. The ALJ found Dr. Wolfe's disability opinion was not supported by his own treatment records, and was inconsistent with Brock's reported activities. *Id.* at 539.

Generally, the medical opinion of a treating physician is given great weight in disability cases, because the relationship between treating physician and patient gives the doctor a good

opportunity to know and observe the patient as an individual. *Ramirez v. Shalala,* 8 F.3d 1449, 1453 (9th Cir. 1993). When the treating relationship is very brief, this premise is less persuasive as a basis for enhancing the weight of the medical opinion.

Furthermore, the question of whether a claimant is employable is not a medical opinion about specific functional limitations, but an administrative finding which the regulations reserve to the Commissioner. Opinions on issues reserved to the Commissioner cannot be given special significance, even when offered by a treating physician. 20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-5p, 1996 WL 374183, *2-3. Dr. Wolfe's opinion that Brock is unable to work is not a medical opinion within his expertise, but an administrative finding requiring vocational expertise and reserved to the Commissioner.

The weight to be given a medical opinion is determined by the extent to which it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent" with other evidence of record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ found Dr. Wolfe's treatment notes did not include findings supporting his opinion. Admin. R. 539. When Brock established care with Dr. Wolfe in July 2005, she gave him an extensive problem list and subjective history. Notably, she claimed she could no longer drive a bus because of chronic pain from generalized arthritis affecting the upper extremities, back, knees, and one ankle. *Id.* at 696-97. This account differs from her claim to Dr. Camplair that she quit driving a bus due to distractions and from the evidence that she was terminated for unauthorized absences after being cleared by her doctor to return to work. Dr. Wolfe prescribed medications for diabetes and hypertension and planned to send for medical records. *Id.* at 696.

After one week Brock returned with a form her attorney wanted Dr. Wolfe to complete in support of her social security disability claim. Laboratory results showed her diabetes and hypertension had improved with medication, but were not fully controlled. *Id.* at 695. In August 2005, Brock again requested that Dr. Wolfe complete the form sent by her attorney. Her hypertension had improved. She had restricted range of motion in the shoulders and Dr. Wolfe attributed this to tendinitis. Dr. Wolfe still did not have Brock's past medical records and did not know whether they included x-rays or MRI scans of the shoulders. *Id.* at 694. On August 22, 2005, Brock returned with complaints of depressive symptoms and reported that Dr. Camplair thought she had ADHD. Dr. Wolfe made no findings on examination, except that her blood pressure was elevated. He discontinued her long-term prescription for generic Prozac and started Effexor, a new antidepressant medication. *Id.* at 693. Dr. Wolfe wrote his disability opinion letter on August 25, 2005. *Id.* at 687-88.

These progress notes show Dr. Wolfe did not have medical records or clinical evidence from which he could rationally conclude that Brock had been unable to work for three years. He had known Brock for only one month when he reached this conclusion and his knowledge about Brock's medical history was limited to what she told him. His finding that her primary limitation was degeneration in her shoulders was supported to some extent by range of motion measurements, but he did not have diagnostic images, a capacity assessment, or any basis other than Brock's subjective report upon which to determine the cause, severity, or limiting effect of her shoulder pain. He concluded Brock had arthritis in her shoulders, hips, and knees, but did not obtain a reliable medical history from past records, diagnostic images, or laboratory tests. He believed Brock had marked depressive symptoms, but this was before she received the benefit of the change in prescriptions

from Prozac to Effexor.  After Dr. Wolfe wrote the disability letter, Brock reported significant improvement in her depressive symptoms with Effexor.  *Id.* at 692.

The ALJ's conclusion that Dr. Wolfe's disability opinion was not supported by his own treatment notes is reasonable given the brief relationship, minimal findings, and apparent focus on obtaining a disability opinion.  This is a permissible consideration within the ALJ's responsibility for determining credibility, resolving conflicts in the medical evidence and resolving ambiguities. *Bayliss v. Barnhart,* 427 f.ed 1211, 1216 (9th Cir. 2005); *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001).

The ALJ's conclusion is also supported by substantial evidence.  The ALJ could reasonably conclude Dr. Wolfe's opinion was based more on Brock's subjective history than on medical evidence.  Having found Brock's subjective statements unreliable, the ALJ could properly conclude Dr. Wolfe's opinion was no more reliable than the statements upon which it was based. *Fair,* 885 F.2d at 605; *Tonapetyan,* 242 F.3d at 1149.

The ALJ's other reason for partially discounting Dr. Wolfe's opinion is also supported by substantial evidence.  As described previously, the reports from Brock, her daughter, and the lay witnesses describe activities that are inconsistent with Dr. Wolfe's opinion that Brock could not use her upper extremities, was able to stand for only short periods, and had debilitating symptoms of depression.  Admin. R. 274-85, 509-14.

In summary, the ALJ gave only partial credit to Dr. Wolfe's opinion because the brief treatment relationship and lack of medical findings in the treatment notes suggested he relied primarily on Brock's questionable subjective history and because reported activities exceeded the

limitations in Dr. Wolfe's opinion.  This reasoning is clear and convincing and supported by substantial evidence in the record. *Thomas,* 278 F.3d at 956-57.

Dr. Chester began treating Brock in May 2006.  Brock claimed a history of fibromyalgia with chronic pain in the neck and back for which she stayed in bed 15 hours a day.  Her diabetes was poorly controlled, but her depression was controlled with Effexor.  Dr. Chester prescribed fibromyalgia management classes, long-acting oxycodone, and exercise.  Admin. R. 805-06.  Brock returned to Dr. Chester at monthly intervals through December 2006, for a variety of ailments including a knee sprain, a headache, a back sprain, lower leg pain, coughing that persisted for one week, an upper respiratory infection, and for evaluation of Brock's concern that she might have bipolar disorder. *Id.* at 750-54, 756-61, 768, 772, 779, 793-94.

On April 27, 2007, Dr. Chester wrote a disability letter identifying Brock's multiple chronic health conditions included poorly controlled diabetes, fibromyalgia diagnosed 10 years earlier, asthma, morbid obesity, and osteoarthritis with limited range of motion in the shoulders.  Dr. Chester stated Brock's mental health conditions included dysthymia, generalized anxiety disorder, and panic attacks.  She endorsed an estimate of 52 on the GAF scale.  Dr. Chester indicated that medication side effects interfered with Brock's concentration and made it difficult for her to perform complex tasks.  Dr. Chester concluded Brock was disabled from any gainful occupation by chronic pain, medication side effects, and psychological impairment. *Id.* at 1004.

The ALJ gave little weight to Dr. Chester's opinion that Brock was disabled. *Id.* at 540.  The ALJ noted that Dr. Chester's opinion was based on her belief that Brock had carried a fibromyalgia diagnosis for at least 10 years.  This belief was not born out by the record.  The medical records for this case date from at least August 1992.  The first mention of fibromyalgia in these records was in

January 2006, three months before Dr. Chester's disability opinion. Brock then claimed she had been diagnosed with fibromyalgia by an unidentified physician. *Id.* at 856. There is no record of that diagnosis. As noted previously, Dr. Melcher's physical examination did not give him any reason to rule out fibromyalgia, and he added the diagnosis to Brock's records based, at least in part, on her uncorroborated claims of the earlier diagnosis and an extensive family history of fibromyalgia. *Id.* at 855. The medical expert, David Rullman, M.D., studied the extensive medical records and testified that nothing indicated Brock had ever been properly evaluated for fibromyalgia and that she had suggested the diagnosis to her physicians. *Id.* at 1037.

The ALJ also discounted Dr. Chester's opinion to the extent it was based on her assertion that Brock's diabetes was poorly controlled. *Id.* at 540. The record suggests that Brock was able to control her blood sugar levels with proper management of diet and lifestyle factors at the beginning of the relevant period. *Id.* at 339, 342, 344, 466, 470. Later indications of uncontrolled diabetes coincided with periods of noncompliance with prescribed medication and failure to follow through with diabetes management training. *Id.* at 619, 696, 857, 928. Even if Brock's diabetes were poorly controlled, Dr. Chester did not identify specific limitations associated with Brock's diabetes or specify work-related functions her diabetes would prevent her from performing.

The ALJ found Dr. Chester's opinion regarding Brock's mental health and concentration contrary to the evidence and directly contradicted by the findings of Dr. Dickinson. Dr. Chester stated Brock's mental health conditions included dysthymia, generalized anxiety disorder, and panic attacks. The record reflects infrequent depressive symptoms generally controlled by medication and only brief episodes of situational anxiety. Dr. Dickinson found no symptoms of anxiety or depression and no evidence of concentration problems. He concluded Brock would have no

limitations in understanding, remembering, or carrying out simple instructions and no more than slight difficulty with detailed instructions. *Id.* at 741-45. Dr. Chester endorsed an estimate of 52 on the GAF scale, which suggests moderate limitations in global functioning. *DSM-IV,* 32-33. The ALJ found Dr. Dickinson's opinion, including a GAF score of 63, more consistent with the record as a whole. That is a reasonable inference supported by substantial evidence.

Brock correctly argues that a primary care provider such as Dr. Chester is qualified to diagnose and treat psychological conditions and render opinions regarding the limiting effects of such impairments. *Sprague v. Bowen,* 812 F.2d 1226, 1232 (9th Cir. 1987). Accordingly, it would be improper to discredit a primary care physician's opinion regarding mental health limitations based solely on lack of expertise. This does not prevent an ALJ from taking a physicians' areas of expertise into consideration when weighing competing opinions. Here, the ALJ found Dr. Dickinson's opinion carried greater weight than Dr. Chester's, in part, because mental health is within Dr. Dickinson's area of expertise and was the focus of his evaluation of Brock. Dr. Chester does not specialize in mental health issues and her treatment covered the broad range of primary care.

The ALJ noted that Dr. Chester's opinion did not include findings of specific functional limitations other than those in Brock's subjective assertions, which were not credible. The ALJ was entitled to discount Dr. Chester's opinion because it was premised on subjective reporting that was found to be unreliable. *Fair,* 885 F.2d at 605; *Tonapetyan,* 242 F.3d at 1149. In summary, the ALJ articulated specific, legitimate reasons based on substantial evidence in the record for discounting the opinion of Dr. Chester. *Thomas,* 278 F.3d at 956-57; *Magallanes,* 881 F.2d at 751.

Dr. Dickinson completed a form indicating that Brock had moderate restrictions in the ability to interact appropriately with coworkers and respond appropriately to work pressures. Admin. R. 748. The ALJ gave little weight to that aspect of Dr. Dickinson's opinion because the limitations were based on a life-long tendency to somatize psychological stress, but had not interfered with her ability to work in the past. *Id.* at 540. This conclusion is supported by the record as a whole, which reflects complaints of physical symptoms which appear to exceed the medical findings dating back to 1992. Despite this, Brock was able to work successfully until April 2002. The ALJ also found moderate limitations inconsistent with Dr. Dickinson's GAF of 63 which is used to signify only mild limitations in function. *DSM-IV,* 32-33. *Id.* at 540, 744. These reasons adequately explain the limited weight the ALJ gave Dr. Dickinson's opininon.

The ALJ's decision makes clear that he considered all the medical source statements and resolved conflicts between the medical opinions in a reasonable manner. He explained the weight given to the various opinions, and where necessary gave legally sufficient reasons for discounting some while giving greater weight to others. The reasoning is rational and supported by substantial evidence and is consistent with the record as a whole. Accordingly, it will not be disturbed. *Batson*, 359 F.3d at 1193; *Andrews,* 53 F.3d at 1039.

### D.    Requirements of SSR 96-8p

Brock contends the ALJ failed to comply with SSR 96-8p, 1996 WL 374184. SSR 96-8p requires an the ALJ to consider all the relevant evidence in the case record, all the allegations of physical and mental limitations and restrictions, and any available information about symptoms. The ALJ must consider limitations and restrictions imposed by all impairments, even those that do not individually meet the regulatory definition of severe. Brock contends the ALJ did not meet these

requirements because he did not assess whether she is capable of working on a regular and continuing basis, consider all of her impairments and resulting limitations, or assess all of the medical evidence.

Brock contends the ALJ did not consider whether morbid obesity would prevent her from working on a regular and continuing basis. SSR 02-1p requires the ALJ to consider the impact of obesity on a claimant's ability to work. 2002 WL 626049. Here, the ALJ found obesity combined with Brock's other medical conditions to impose severe impairment on her ability to perform work-related activities. He gave full consideration to the RFC assessments of the state agency reviewing physicians and psychologists who, in turn, found morbid obesity a primary source of Brock's functional limitations. The ALJ adopted their findings in his RFC assessment. In addition, he considered all the evidence in the record of limitations flowing from and exacerbated by Brock's obesity. He adopted these limitations to the extent they were credible. Brock has not identified credible evidence of functional limitations flowing from or exacerbated by obesity which the ALJ failed to consider. At most, Brock has identified subjective assertions that were found to lack credibility and speculation regarding limitations that may flow from obesity but for which there is no evidence in the current record.

Brock contends the ALJ failed to consider whether urinary urgency or fatigue due to sleep apnea would prevent her from working on a regular and continuing basis. The ALJ considered the subjective testimony regarding urinary urgency and found it was not credible. The argument regarding fatigue is based on speculation about potential symptoms of sleep apnea without any credible evidence that such symptoms are present in this case. Brock was provided treatment with a CPAP machine, but did not comply with treatment. It is reasonable for the ALJ to conclude that

Brock would put forth greater effort to alleviate fatigue through CPAP treatment if her symptoms were significant.

Brock contends the ALJ failed to consider all of her impairments and resulting limitations. She specified incontinence, concentration, and side effects of medications. The ALJ found Brock's allegations regarding incontinence were not credible. He found her allegations of concentration deficits not credible, contrary to Dr. Dickinson's findings, and inconsistent with her activities. These findings cannot be disturbed because they are based on inferences reasonably drawn from substantial evidence in the record.

Brock contends the ALJ failed to consider the impact of drowsiness and shakiness as side effects of her medications. These impairments are supported only by her subjective testimony which the ALJ found not credible for acceptable reasons. Dr. Rullman noted that fatigue and concentration could be side effects of chronic narcotic pain medications. Admin. R. 506. This speculation about potential side effects of medication is not evidence that such side effects are present in this case. In light of the ALJ's credibility determination and the absence of evidence to corroborate Brock's claim, the ALJ was not required to accept Brock's subjective allegation.

Finally, Brock contends the ALJ failed to consider Dr. Young's statement that Brock can walk continuously for one-half mile or one-half hour at a time and that the ALJ mischaracterized Dr. Young's work release when he found Brock was released back to regular work in July 2002. The ability to walk continuously for one-half hour at a time is reasonably consistent with the ability to walk a total of 2 hours in an 8-hour workday, as found in the ALJ's RFC assessment. The ALJ's interpretation of Dr. Young's work release is also reasonable.

Brock bears the burden of establishing her impairments. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). The ALJ's written decision demonstrates that he considered all the evidence in the case record and all the allegations of limitations and restrictions. He did not find support in the record for the additional limitations Brock now claims. Accordingly, Brock failed to satisfy her burden of proof on these issues.

## II.    <u>Vocational Evidence</u>

Brock contends the ALJ erred in determining she is capable of returning to her past work as a courier on two grounds. First, Brock contends the ALJ failed to compare the functional requirements of her past work with the functional restrictions in her RFC. The ALJ relied on the testimony of a vocational expert who said the sitting, standing, and walking required of a courier is most consistent with sedentary work. The occupation is normally performed at the unskilled level, which requires the mental ability to perform simple tasks. The VE testified that a person with the limitations described in the ALJ's RFC assessment could perform all the requirements of the courier occupation. Admin. R. 540-41, 1044-45. Thus the ALJ considered all the functional limitations supported by the record and all the functional requirements of the occupation, based on the VE's experience and expertise. Brock failed to meet her burden of showing she has additional impairments that would prevent her from performing her past work. *Matthews v. Shalala,* 10 F.3d 678, 680 (9th Cir. 1993).

Second, Brock contends the ALJ elicited testimony from the vocational expert with a hypothetical question that did not contain all of her limitations and restrictions. The ALJ considered all the evidence and framed his vocational hypothetical question based on the limitations supported by the record as a whole. The hypothetical limitations reflected reasonable conclusions that could

be drawn from the evidence in the record.  An ALJ is not required to incorporate limitations based on evidence that he properly discounted.  *Batson,* 359 F.3d at 1197-98.

The court must uphold the Commissioner's determination if it supported by substantial evidence, even if the evidence can also rationally be interpreted in a way that supports Brock's assertion of additional limitations.  *Andrews v. Shalala,* 53 F.3d at 1039 ; *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999).  Brock's contention that the Commissioner's determination was based on improper vocational testimony cannot be sustained.

## CONCLUSION

Based on the foregoing, the ALJ's decision is based on correct legal standards and supported by substantial evidence.  The Commissioner's final decision is AFFIRMED.

DATED this 13th day of November, 2008.

 /s/  Paul Papak
Paul Papak
United States Magistrate Judge